UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:17-CR-79-01 |
| | ) | Judge Phillips |
| RICKY JAMES BENNEFIELD | ) | |

## MEMORANDUM AND ORDER

Defendant Ricky Bennefield pled guilty to the indictment charging three crimes: (1) conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1349, 1343; (2) aiding and abetting theft of government property, in violation of 18 U.S.C. §§ 2, 641; and (3) aiding and abetting aggravated identity theft, in violation of 18 U.S.C. §§ 2, 1028A(a)(1), 1028A(c)(5). These are not uncommon crimes in federal court, but the facts leading to the discovery of these crimes are indeed uncommon. As a result, the defendant has filed numerous objections to the inclusion of those facts in the Presentence Investigation Report ("PSR") [Doc. 38] prepared by the United States Probation Office and whether those facts justify certain sentencing enhancements pursuant to the United States Sentencing Guidelines Manual (2016) ("U.S.S.G.").

The Court has carefully considered the defendant's objections [Doc. 41], the government's response [Doc. 45], the evidence presented at the July 9, 2018 hearing through the testimony of Gatlinburg Police Detective Timothy Williams, and defendant's sentencing memorandum [Doc. 61] as it relates to the objections. For the reasons set forth

herein, the defendant's objections [Doc. 41] will be **SUSTAINED in part** and **OVERRULED in part**.

## I. <u>Background</u>

In December 2016, the Gatlinburg Police Department received information that led them to begin an investigation into the relationship of the defendant with his then-minor step-daughter, Stormi Chastain, the death of the defendant's father-in-law, Franklin Chastain, and the subsequent theft of Mr. Chastain's Social Security and pension benefits by the defendant and his wife, co-defendant Erika Bennefield. In the course of this investigation, which later encompassed other law enforcement agencies, it was revealed that defendant had a years-long sexual relationship with Stormi Chastain and that he is the father of her child, Maci. It was also revealed that Franklin Chastain had died approximately six years prior, in June 2010, during a family trip to Florida.

The defendant and Mrs. Bennefield moved Mr. Chastain from Alabama to their home in Tennessee. No witness clearly states when this move occurred, but it appears that he moved to Tennessee in late 2009 or early 2010.[1] Beginning in late December 2009 through March 2013, Mr. Chastain's Social Security checks were sent to a Post Office Box in Gatlinburg, Tennessee, that was paid for by the Bennefields [PSR ¶¶ 7—9]. Beginning

---

[1] The Indictment alleges that Mr. Chastain came to live with the Bennefields "beginning in 2009" [Doc. 1 at ¶ 2]. According to the PSR, Mr. Chastain's daughter, Kristal Stewart, related that the Bennefields relocated Mr. Chastain to Tennessee "sometime between 2010 and 2012" [PSR ¶ 26]. Jim Stewart, Kristal Stewart's ex-husband, believed that Mr. Chastain "left Alabama with the Bennefields in 2008 or 2009" [PSR ¶ 31]. Other witnesses, including Erika Bennefield, could not recall when Mr. Chastain moved to Tennessee [*see* PSR ¶¶ 27, 28, 32, 33].

in June 2010, Mr. Chastain's pension benefits from the Tyler Union Hourly Pension plan were mailed to the same Gatlinburg Post Office Box [*Id.* at ¶ 13]. From March 2013 through 2016, Mr. Chastain's Social Security benefits were transferred by wire onto a debit card [*Id.* at ¶ 10]. Both defendant and Mrs. Bennefield admit that they converted Mr. Chastain's Social Security and pension benefits for their own use [*Id.* at ¶¶ 11, 13].

At the July 9, 2018 hearing, Detective Williams introduced audio clips from investigative interviews with Ms. Chastain and the defendant that took place in December 2016 and January 2017. In these interviews, both Stormi Chastain and the defendant maintain that Mr. Chastain simply died in the car on the way to Florida in June 2010. The defendant admittedly "panicked" and decided to leave Mr. Chastain's body on the side of a road somewhere near the Florida/Alabama border. The defendant says he "laid him out" and covered Mr. Chastain's body with grass. The family drove on for about 30 minutes and then returned to the site of Mr. Chastain's body. Mr. Chastain was put back in the car, driven for some period of time, and then "laid out" again near some woods. Both the defendant and Ms. Chastain state that, at the time of his death, Mr. Chastain was elderly and "banged up" with bruises and scrapes from frequent falls. Both Ms. Chastain and the defendant assert that the defendant was afraid to take Mr. Chastain to a hospital or notify authorities about his death because the defendant did not want anyone to think he had harmed Mr. Chastain. Mr. Chastain's death was never reported to law enforcement prior to their interview with Stormi Chastain in December 2016.

Subsequent to his death, defendant and his wife began taking Mr. Chastain's Social Security benefits and his pension benefits for their own use. According to Ms. Chastain,

the defendant said he "would have to keep drawing [Mr. Chastain's benefits] because that was the only thing there was to do" since they did not take him to the hospital.

After interviewing Ms. Chastain in December 2016, officers went to the Bennefield residence in Sevier County to question the defendant. However, the defendant had fled from the home and was captured a few days later. When he was interviewed by law enforcement, defendant admitted to many of the details that officers learned from Ms. Chastain. It is undisputed that the cause of Mr. Chastain's death is unknown and his body has never been located. In audio clip 4, defendant claimed that he knew "exactly" where Mr. Chastain's body was left and he described a location off Highway 231 in Jackson County, Florida. It is undisputed that law enforcement agencies have searched unsuccessfully multiple times for Mr. Chastain's body.

## II.    <u>Summary of Objections</u>

Defendant has filed numerous objections to the PSR [Doc. 41]. Many of the objections are to purported factual information contained in the description of "The Offense Conduct" in the PSR: paragraphs 5, 6, 12, 16, 18, 20, 21, 22, 23, 26, 27, 28, 29, 31, 32, and 33. Defendant objects to the paragraphs applying enhancements to his advisory Guideline calculation: paragraphs 35, 45, and 47. Relatedly, defendant objects to paragraphs 48, 52, and 86 as they incorporate the objected-to enhancements in calculating his advisory Guideline range. Finally, defendant objects to paragraphs 140, 143, 144, 145, and 146 as they identify possible grounds for an upward departure or variance to the defendant's advisory Guideline calculation.

The U.S. Probation Office has declined to remove or alter any of the objected-to information in the PSR [Doc. 44]. The government contends that the PSR, including the Guideline enhancements, should remain as currently written with the possible exception of paragraphs 18 and 22 [Doc. 45].

## III.      Objections to Factual Information

Defendant has objected to PSR paragraphs 5, 16, 18, 20, 22, 29, 31, and 33 solely on the grounds of lack of relevance [*see* Doc. 41 at ¶¶ 1, 4, 5, 6, 8, 13, 14, 16]. Defendant objects to PSR paragraphs 6, 12, 21, 23, 26, 27, 28, and 32 because they contain information obtained from other witnesses and because he avers that some of the information is false [*see id.* at ¶¶ 2, 3, 7, 9, 10, 11, 12, 15]. Defendant also contends that this information is irrelevant or immaterial to the instant offenses.

As the government correctly notes in response, there is no limit on the information concerning a defendant's background, character, and conduct which may be considered for the purpose of imposing an appropriate sentence. 18 U.S.C. § 3661; U.S.S.G. § 1B1.4. Further, the Sixth Circuit has interpreted Fed. R. Crim. P. 32(i)(3)(B) "to stand for the proposition that, if a defendant objects to the PSR, the district court may not simply adopt the PSR's contents, but 'must *actually find facts*.'" *United States v. Roark*, 403 F. App'x 1, 4 (6th Cir. 2010) (quoting *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007)). This Court may rely on information contained in the PSR "if it bears minimal indicia of reliability." *Id*. at 5. Further, the defendant's objection "does not magically render such information unreliable." *Id.*

The Court begins by noting that the information contained in these paragraphs is a *summary* of information obtained from a lengthy and far-reaching investigation and provides background information and context to the defendant's crimes. It is worth noting that the defendant does not dispute that an investigation into his crimes against his step-daughter opened the proverbial Pandora's Box and led to the discovery of the instant offenses. While the defendant may regret the way his crimes were discovered, that is simply the way in which law enforcement discovered the instant offenses. Further, the factual information to which defendant objects will not affect the Court's determination of his sentence. Accordingly, the Court declines the defendant's invitation to parse the factual description in the PSR and finds that a ruling on these objections is not necessary. Fed. R. Crim. P. 32(i)(3)(B).

More importantly, the Court finds it appropriate to note the key background information that is undisputed. The defendant admits that Mr. Chastain lived with the Bennefields in Tennessee for at least several months prior to his death. The defendant admits that Mr. Chastain died in the car while traveling to Florida in 2010. The defendant admits that he "laid him out" and covered his body with grass at an unspecified location.[2]

---

[2]The Court finds defendant's objections to the PSR's description that Mr. Chastain was "buried" to be specious and bordering on frivolous. The Merriam-Webster Dictionary defines "bury" as "to dispose of by depositing in *or as if in the earth*;" "to conceal by or *as if by covering with earth*;" or "to cover from view." The defendant admitted that he "laid out" Mr. Chastain's body and covered it with grass; in other words, he covered the body from view. Ms. Chastain stated that they covered Mr. Chastain with sticks. Regardless of the terminology used, the Court is not confused about how Mr. Chastain was treated. The Court further finds the defendant's disputes as to the possible locations where Mr. Chastain's body was left to be disingenuous. As noted, it is undisputed that Mr. Chastain's body was left in two undetermined locations near the Alabama/Florida border. Finally, the Court finds defendant's contention that Ms. Chastain did not

After driving for some period, the defendant admits that he returned, placed Mr. Chastain's body back in the car, drove further, and "laid him out" again at another unspecified location. The defendant admits that he never reported Mr. Chastain's death. The defendant admits that he and his wife stole Mr. Chastain's Social Security and pension benefits for approximately six years. Further, it appears undisputed that the Bennefields rebuffed various efforts by Mr. Chastain's family to contact or visit him over the years, thus perpetuating the charade that he was still alive. These facts are material, relevant, and will be considered by the Court in fashioning an appropriate sentence in accordance with 18 U.S.C. § 3553(a).

## IV.    Use of a Minor U.S.S.G. § 3B1.4

Defendant objects to the enhancement in PSR paragraph 45 pursuant to U.S.S.G. § 3B1.4 for using a minor to commit a crime. Defendant denies that he used his step-daughter "to commit the crimes charged" [Doc. 41 at ¶ 18]. PSR paragraph 45 states that defendant used Ms. Chastain "to move and obscure Franklin Chastain's body" and that she assisted in hiding the body a second time [PSR ¶ 45]. The PSR also states that Ms. Chastain "had knowledge that the defendant and his wife still received Franklin Chastain's retirement benefits after his death" [*Id.*].

The government responds [Doc. 45 at p. 8] that defendant made both the step-daughter and minor son observe their grandfather dumped on the side of the road and then

---

help him move Mr. Chastain's body to be incredible and that issue is discussed in more detail *infra*.

made them keep it a secret for years. Additionally, the step-daughter was made to participate in "stuffing her grand-father's corpse in and out of the vehicle and burying him by the side of the road multiple times, then made to keep quiet about the acts" [*Id.*].

U.S.S.G. § 3B1.4 applies a two-point enhancement to a defendant's offense level computation if "the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense." Application note 1 to § 3B1.4 defines "used or attempted to use" to include "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting."

The Sixth Circuit examined this enhancement in *United States v. Butler*, 207 F.3d 839 (6th Cir. 2000). Noting that the Guideline should be interpreted with a "plain language" approach, the dictionary definition of "use" includes "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of; to put into action or service, especially to attain an end." *Id.* at 847 (quoting Black's Law Dictionary 1541 (6th ed. 1990)). Thus, "the definition of 'use' supports the notion that § 3B1.4 would require more affirmative action on the part of a defendant." *Id.* Further, "the enhancement should apply when a defendant takes affirmative acts to involve a minor." *Id.* at 848; *see United States v. Yancy*, 725 F.3d 596, 599 (6th Cir. 2013) (§ 3B1.4 "does not require *substantial use* of a minor, only *use* or *attempted use* of a minor") (emphasis in original). The Sixth Circuit has also held that § 3B1.4 does not impose a knowledge requirement on the minor who is used in the commission of the offense. *United States v. Jenkins*, 229 F. App'x 362, 369 (6th Cir. 2005).

It is undisputed that Ms. Chastain was present when Franklin Chastain died and that she saw his body "laid out" in two undetermined locations near the Alabama/Florida border.  There is evidence that she assisted the defendant in moving Mr. Chastain's body. In audio clip 4, Ms. Chastain states "I helped him" put Mr. Chastain out; "*we* put him" in the woods; "*we* covered him up with sticks" and that she placed Mr. Chastain's "hands like they should be."  Tellingly, in audio clip 3, Ms. Chastain described an earlier incident where Mr. Chastain fell at their home in Sevier County and they called an ambulance to come and pick him up.  She notes it would take "all of us to pick him up."  Further, in audio clip 1, the defendant initially states, "*we* laid him out" before correcting himself by stating, "*I* laid him out."  PSR paragraph 32 contains information from a May 17, 2017 interview with co-defendant Erika Bennefield who stated, "Ricky and Stormi placed Franklin Chastain's body in the tree line."  Shortly thereafter, they returned and "Ricky and Stormi placed the body back into the vehicle" and later "Ricky and Stormi placed the body in another wooded area" [PSR ¶ 32].

Defendant denies that Ms. Chastain participated in moving or "laying out" Mr. Chastain's body.  In light of the evidence from three sources, including Ms. Chastain's own admission that she did assist the defendant, the Court finds this denial to be incredible. There is certainly a preponderance of the evidence that Ms. Chastain was utilized or put into action in moving and disposing of Mr. Chastain's body.

However, § 3B1.4 applies when the minor is used "to commit *the offense* or assist in avoiding detection of, or apprehension for, *the offense*."  The offenses to which defendant has pled guilty in this Court are those related to the theft of Mr. Chastain's Social

Security and pension benefits, not his disappearance or death. It appears undisputed that Ms. Chastain knew that the defendant and his wife were taking Mr. Chastain's benefits, but there is no evidence that the defendant took "affirmative acts" to involve her in these crimes. *See Butler*, 207 F.3d at 848. Indeed, *Butler* requires "a showing of more than a mere criminal partnership" for application of §3B1.4. *Id.* at 849. Thus, Ms. Chastain's mere knowledge of the theft of benefits would not rise to the level of an affirmative act to warrant the imposition of § 3B1.4. *See United States v. Paine*, 407 F.3d 958, 965 (8th Cir. 2005) (§ 3B1.4 "is only applicable if a defendant directs, trains, or in some way affirmatively engages the minor participant in the crime of conviction") (quoting *United States v. Suitor*, 253 F.3d 1206, 1210 (10th Cir. 2001)); *United States v. Molina*, 469 F.3d 408, 414—15 (5th Cir. 2006) (additional circumstances beyond the minor's presence are required for § 3B1.4 enhancement); *United States v. Jimenez*, 300 F.3d 1166, 1170 (9th Cir. 2002) (same).

The government takes the position that the defendant made Ms. Chastain and her minor brother remain silent about Mr. Chastain's death in order to avoid detection for the instant offenses. The PSR contains no information from any witness who stated that the defendant directed either Ms. Chastain or her brother to remain silent *about the theft of benefits*. Detective Williams testified that Ms. Chastain stated that she lived in fear of the defendant and that she was instructed to keep quiet *about Mr. Chastain's death*. In audio clip 6, Ms. Chastain was asked if the defendant ever threatened her or her mother about revealing what happened to Mr. Chastain and she responded affirmatively. However, when asked about the benefits, Ms. Chastain simply stated that the defendant said, "he would

have to keep drawing it, because that was the only thing there was to do" since they did not

take Mr. Chastain to the hospital. Again, there is no evidence that the defendant directed

Ms. Chastain to remain silent about the theft of benefits — the offenses of conviction.

Thus, the Court must follow the language of the Guideline and conclude, in the absence of

any evidence to the contrary, that Ms. Chastain was not "utilized" in committing the instant

offenses or in avoiding detection for those offenses. Accordingly, the Court finds that the

defendant did not "use a minor" in the commission of the instant offenses as described by

§ 3B1.4 and the application of that enhancement in paragraph 45 must be removed. The

defendant's objection to paragraph 45 is **SUSTAINED**.


## V.      Obstruction of Justice U.S.S.G. § 3C1.1

Defendant objects to the characterization of his conduct in PSR paragraph 35 and to

the application of the enhancement in paragraph 47 of the PSR pursuant to U.S.S.G. §

3C1.1 for obstruction of justice. Defendant states that disposing of Mr. Chastain's body

and not reporting his death occurred before any investigation and "before the offense

occurred" [Doc. 41 at ¶¶ 17, 19].

The government responds that the defendant violated the law by "dumping" Mr.

Chastain's body, regardless of the state where he was finally buried [Doc. 45 at pp. 6—7].

The government also notes that defendant told investigators that he knew where Chastain

was buried, but he lied to them and sent them on a wild goose chase. Thus, the government

contends that defendant obstructed justice by dumping Chastain's body, by not reporting

his death, by lying to law enforcement about the location of the body, and by forcing his family to keep his secrets for years.

Paragraph 35 of the PSR states that the defendant obstructed justice "when he did not report Franklin Chastain's death and disposed of his body" [PSR ¶ 35]. Paragraph 47 applies the obstruction enhancement because defendant:

> disposed of Franklin Chastain's body and continued to receive Franklin Chastain's retirement benefits. Further, he moved the body a second time to a more "secure location." If the defendant had reported Franklin Chastain's death, he would have been unable to commit the instant offense.

[PSR ¶ 47]. In response to the objection, the Probation Officer states that not reporting Mr. Chastain's death "was done in preparation of" the instant offense, thus it is relevant conduct [Doc. 44 at p. 3]. Further, she opines that defendant continued to obstruct justice "every day that he did not report Franklin Chastain's death" because that allowed the crime to continue (and benefits to be paid) [*Id.*].

The two-point enhancement in § 3C1.1 applies if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. Application note 1 to § 3C1.1 states, "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered … if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." Application note 9 to § 3C1.1 states "the defendant is accountable for the defendant's own conduct and for conduct that

the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused."

The government must prove obstruction of justice by a preponderance of the evidence. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002). Defendant does not really dispute that he violated the law (of either Alabama or Florida) by leaving Mr. Chastain's body "laid out" next to a road. It is also undisputed that this conduct occurred prior to the start of any investigation of the instant offenses. Indeed, it may have occurred prior to the theft of benefits. Although the record is unclear as to when the defendant and his co-defendant began taking Mr. Chastain's benefits, it seems that they did not do so until after Mr. Chastain's death.[3] Thus, the mistreatment of Mr. Chastain's body could not reasonably be considered "purposefully calculated, and likely, to thwart the investigation or prosecution of" the instant offenses.

The Probation Office takes the position that the defendant's failure to report Mr. Chastain's death "was done in preparation" for the instant offenses. In fact, there is no evidence to support this assertion. As the government notes, it is an open question whether the instant offenses were an "afterthought" following Mr. Chastain's death or whether his death was a means to the crime. Further, there is nothing in § 3C1.1 which supports the position that failure to admit a crime, *i.e.*, silence about Mr. Chastain's death, supports an

---

[3]The Indictment alleges that the Bennefields conspired to steal Mr. Chastain's benefits "[f]rom on or about June 20, 2010 through December 2016" [Doc. 1 at ¶ 6]. Although it appears undisputed that Mr. Chastain's Social Security benefits were sent to the Gatlinburg Post Office Box prior to his death, there is no evidence in the record that the Bennefields began taking those checks for their own use before he died.

enhancement for obstruction.  *See United States v. Kupfer*, 792 F.3d 1226, 1233 (10th Cir. 2015) ("[h]er failure to speak up cannot serve as the basis for an increase in the offense level under § 3C1.1"); *United States v. Pelliere*, 57 F.3d 936, 939 (10th Cir. 1995) ("denials of guilt or refusals to talk cannot serve as the basis for an obstruction of justice enhancement").

As noted above, the defendant threatened Ms. Chastain and her mother to remain silent about Mr. Chastain's death, but the record does not reveal when he made this threat. Viewing the facts (or lack thereof) in the light most favorable to the defendant, it appears that the threat to remain silent about Mr. Chastain's death occurred prior to the theft of benefits and well before the investigation of the instant offenses.  While one might reasonably infer that the defendant threatened his family to remain silent about *the theft of benefits* as well as Mr. Chastain's death, there is simply no evidence in the record on this point.

As for the government's assertion that the defendant sent law enforcement on a "wild goose chase" with false information on the location of Mr. Chastain's body, the question is whether this "obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to … the instant offense of conviction."  In audio clips 4 and 11, the defendant provided fairly specific directions to where he left Mr. Chastain's body and was "pretty positive" he could find it.  However, the correct location of Mr. Chastain's body is not relevant to the instant offenses and did not impede the government's ability to investigate or prosecute these offenses.  Moreover, as noted by

defense counsel and as agreed by Detective Williams, many things could have happened to Mr. Chastain's body in the intervening years.

Accordingly, for all of these reasons, the Court finds that the defendant did not obstruct justice as defined in § 3C1.1 with respect to the offenses of conviction and the enhancement should not be applied. The defendant's objections to PSR paragraphs 35 and 47 are **SUSTAINED**.

Related to the two enhancement objections, defendant objects to PSR paragraphs 48, 52, and 86 as they contain the offense level calculations including those enhancements [Doc. 41 at ¶¶ 20, 21, 22]. In light of the Court's conclusions set forth above, the defendant's objections to PSR paragraphs 48, 52, and 86 are **SUSTAINED**.

## VI.     Objections Regarding Grounds for Upward Variance or Departure

Defendant has objected to PSR paragraph 140, which identifies potential grounds for departure, and to PSR paragraphs 143—146, which identify potential grounds for a variance from the Guidelines. As to PSR paragraph 140, defendant contends that this is not a proper case for an upward variance [Doc. 41 at ¶ 23]. As to PSR paragraphs 143, 145, and 146, defendant objects to the suggestions of upward variance because of his prior financial crimes, which he notes are 27 and 29 years old respectively [*Id*. at ¶¶ 24, 26—27]. Finally, as to PSR paragraph 144, defendant contends it is "not factually accurate to state that he preyed on his elderly father-in-law to commit this offense" because "his father-in-law was dead during the commission of this offense" [*Id*. at ¶ 25].

The probation officer notes that, as in all cases, the PSR identifies potential grounds for departure or variance [Doc. 44 at p. 4]. The government responds that the defendant's prior financial crimes are to be considered pursuant to 18 U.S.C. § 3553(a) [Doc. 45 at p. 8]. Further, the government notes that because Mr. Chastain's body has never been found, it is an open question whether the instant offenses "were an afterthought or the death was a means to the crime" [*Id.*].

The Court notes that the PSR "must" contain "any basis for departing from the applicable sentencing range." Fed. R. Crim. P. 32(d)(1)(E). As the probation officer notes, these PSR paragraphs do not affect the calculation of defendant's advisory Guideline range. They merely identify potential grounds for departure or variance, issues that the Court will address at sentencing. The defendant may make any appropriate arguments against the propriety of a departure or variance at that time. Accordingly, the defendant's objections to paragraphs 140, 143, 144, 145, and 146 are **OVERRULED**.

## VII.    Conclusion

For the reasons set forth above, the defendant's objections [Doc. 41] are **SUSTAINED IN PART and OVERRULED IN PART**. Specifically, defendant's objections to paragraphs 35, 45, 47, 48, 52, and 86 of the Presentence Investigation Report are **SUSTAINED**. Defendant's objections to paragraphs 5, 6, 12, 16, 18, 20, 21, 22, 23, 26, 27, 28, 29, 31, 32, and 33 of the Presentence Investigation Report are **OVERRULED as moot**. Defendant's objections to paragraphs 140, 143, 144, 145, and 146 of the

Presentence Investigation Report are **OVERRULED**.  Sentencing remains set for <u>August 22, 2018 at 10:00 a.m.</u> in Knoxville.

IT IS SO ORDERED.

<u>    s/ Thomas W. Phillips                        </u>
SENIOR UNITED STATES DISTRICT JUDGE